# IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

| | |
|---|---|
| MARSHALL ALLEN,<br><br>        Plaintiff,<br><br>vs.<br><br>PEABODY NEW MEXICO SERVICES, LLC,<br><br>        Defendant. | Case No. 1:19-CV-0120-SWS/MLC |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This matter arose out of the termination of Plaintiff Marshall Allen's employment with Defendant Peabody New Mexico Services, LLC ("Peabody") in early January of 2019. On February 12, 2019, Plaintiff filed this action against Peabody alleging violations of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615. The Court, having considered the evidence presented during the bench trial in this matter, the parties' filings in this case, and the arguments of counsel, FINDS and CONCLUDES as follows:

### FINDINGS OF FACT

1. Plaintiff was hired by Defendant Peabody on January 24, 2011 as a welder and began working as a mechanic around 2012. At all relevant times, Plaintiff worked a schedule consisting of four days on followed by four days off. Walt Murawski[1] is Human

---

[1] Mr. Murawski was originally named as an additional defendant in Plaintiff's complaint. However, Plaintiff agreed to Mr. Murawski's dismissal at the conclusion of the bench trial. (*See* ECF No. 36 at 4.)

Resources Manager for Peabody. Plaintiff reported to foremen who varied depending on the shift, but his general supervisor was Juan Tena. Mick Derudder is Tena's supervisor. (Stip. Facts ¶¶ 1-4, ECF No. 25.)

2. Peabody's employee handbook includes policies related to paid time off ("PTO"), FMLA leave, and employee misconduct. *Id.* ¶ 5. PTO that is not scheduled at least twenty-four hours in advance of the employee's start time is considered an unscheduled PTO occurrence. *Id.* ¶ 8. When an employee has an unscheduled PTO occurrence, the employee is required to call his/her supervisor in their chain of command, preferably before the start of the shift. *Id.* ¶ 9. Mr. Tena was the supervisor whom Plaintiff was required to call regarding an unscheduled PTO occurrence. *Id.* ¶ 16. Employees are required to submit a doctor's note if their unscheduled PTO is for three or more consecutive days. *Id.* ¶ 10. Employees who fail to follow the call-in procedures for two consecutive shifts are terminated for job abandonment. *Id.* ¶ 11. Due to his tenure, Plaintiff was given 240 hours of PTO on January 1, 2018 for the year. *Id.* ¶ 13. Employees who are absent after they run out of PTO are terminated, unless their absence is covered by FMLA. *Id.* ¶ 14. By August 12, 2018, Plaintiff had used all 240 hours of his PTO for the year. *Id.* ¶ 15.

3. Peabody's employee handbook also includes specific examples of misconduct which can subject employees to discipline, up to and including termination. (Stip. Facts ¶ 7.) One such example is the "[f]alsification of any information relating to your employment and/or benefits including, but not limited to, timekeeping, medical information or other records." (Def.'s Trial Ex. 1, ECF No. 36-2 at 27.)

4. On the morning of December 12, 2018, an off-day for Plaintiff, he was treated for a non-work-related shoulder injury at the Tsehootsooi Medical Center Primary Care Clinic ("Clinic") in Fort Defiance, Arizona, where he received a doctor's note. (*See* Stip. Facts ¶¶ 17-18; Pl.'s Trial Ex. 2, ECF No. 36-1.) Plaintiff did not provide this doctor's note to Peabody. (Stip. Facts ¶ 19.) However, in the minutes following his Clinic visit, Plaintiff began attempts to contact Peabody representatives – first trying Mr. Tena at 505-285-3032 (9:22 a.m.), then trying Mr. Murawski at 505-285-3039 (9:23 a.m.) and Peabody's main office number (505-285-3000) (9:23 a.m.). (*See* Def.'s Trial Ex. 15 at 7, lines 154-156, ECF No. 36-3 at 28 (Plaintiff's cell phone records); Trial Tr. 82:19-83:25.)

5. At 9:27 a.m., Plaintiff reached Mr. Murawski and told him about his shoulder injury and that he may need time off work. (*See* Def.'s Trial Ex. 15, line 157 (record of 4-minute call from Plaintiff's cell phone to Murawski's office phone); Trial Tr. 21:10-13.) Because he had exhausted his allowed PTO, Plaintiff knew he needed to request FMLA leave for any absence necessitated by his shoulder injury. (Trial Tr. 19:23-20:22, 21:14-15.) Murawski provided Plaintiff the number to call at Lincoln Financial, Peabody's third-party FMLA administrator, regarding an FMLA request. (*See* Trial Tr. 21:15-18, 110:17-21.) Plaintiff placed a call to Lincoln Financial (888-408-7300) immediately after speaking with Mr. Murawski. (Def.'s Trial Ex. 15 at 7, line 158.)

6. Thereafter that same day, between 10:41 a.m. and 2:13 p.m., Plaintiff continued his attempts to reach his supervisors – calling Mr. Tena's office number five times, his shift supervisor's number (505-285-3028) once, and Mr. Derudder's office number (505-285-3059) once. *Id.* at 7. Plaintiff finally received a return call from Mr.

Tena at 2:18 p.m. *Id.*, line 174. Plaintiff told Tena about his shoulder injury and that he might need to miss work the following week. (*See* Trial Tr. 15:9-15, 16:12-18.)

7. Plaintiff requested leave through Lincoln Financial on or about December 14, 2018, which triggered a request for short-term disability pay. (Stip. Facts ¶ 20; Def.'s Trial Ex. 15 at 9, line 218 (record of 13-minute telephone call with Lincoln Financial).) After four scheduled days off (Wednesday through Saturday, December 12-15), Plaintiff was scheduled to work his next 4-day shift beginning Sunday, December 16th. (Stip. Facts ¶ 21.) Plaintiff did not work or call anybody at Peabody on December 16, 17, 18 or 19.[2] Mr. Tena reported to Murawski that Plaintiff was a no-call/no-show on December 16, 17, and 18, which resulted in Plaintiff's initial termination. (Stip. Facts ¶ 22.) Peabody sent Plaintiff a letter via certified mail on December 18, 2018, advising of his termination because he was a "no show" on three consecutive days. *Id.* ¶ 23. The December 18, 2018 letter eventually was returned to Peabody as "undeliverable" after Plaintiff failed to claim the registered mail.[3]

8. Meanwhile, Plaintiff reported for work on December 24th, his next regularly scheduled shift, and worked his normal schedule on December 24, 25, 26, and 27. On December 26th, when Mr. Murawski returned to work after the holiday, he met with Plaintiff. Murawski informed Plaintiff he had been terminated via the certified letter due

---

[2] Plaintiff testified he called Tena again on December 14th to advise Tena he would need to miss the next week of work. (Trial Tr. 16:24-18:20.) This assertion, however, is not supported by Plaintiff's phone records. (*See* Def.'s Trial Ex. 15.)

[3] Although this fact was stipulated by the parties (*see* Stip. Facts ¶ 24), Plaintiff testified he later (after his December 26th meeting with Murawski) checked his mailbox and saw that he had received the termination letter. These seemingly inconsistent assertions were not reconciled during trial; regardless, this issue is not material to the Court's findings herein.

to Tena's report that Plaintiff had been a no-show for three consecutive days. (Stip. Facts ¶ 28.) During this meeting, Plaintiff denied having received the termination letter and adamantly claimed he had told Tena sometime during the week of December 12 that he would need to miss work the following week due to his shoulder injury. (*See* Stip. Facts ¶ 29; Trial Tr. 114:6-7.) Murawski then contacted Tena, who was vacationing in Mexico at that time. Tena said Plaintiff may have told him he would need to miss work, but he could not remember. (Stip. Facts ¶ 29; Trial Tr. 113:2-8.) Murawski then reversed Plaintiff's initial termination, believing it would be unfair to terminate him if he had given prior notice of his absences. (Stip. Facts ¶ 30; Trial Tr. 114:3-11.)

9. Also during that December 26th meeting, Murawski requested Plaintiff provide a doctor's note regarding his absence from work December 16-19. (Stip. Facts ¶ 31; Trial Tr. 113:22-23.) Murawski testified Plaintiff then went to his vehicle and came back, providing Murawski with a note from the Tsehootsooi Clinic which indicated he had been seen again on the morning of December 17, 2018. (Stip. Facts ¶ 32; Trial Tr. 113:25-114:1; Pl.'s Trial Ex. 3, ECF No. 36-1 at 3.) The note further indicated Plaintiff should not work from "12/16/18 to 12/24/18." (Pl.'s Ex. 3.) Murawski testified he did not look closely at the note until December 28th, at which time he noticed the note had been filled out and signed in blue ink, however, in black ink, the number "6" had been written over the number "7" in 12/17/18, changing the work restriction dates to indicate excusal from 12/*16*/18 to 12/24/18. (*See* Stip. Facts ¶ 33; Trial Tr. 114:19-116:5.)

10. Murawski testified he then called the Medical Center to get more information, and the woman he spoke with in "medical records" told him Plaintiff had been

seen on December 17th and was excused from work 12/17/18 through 12/24/18.[4] (Trial Tr. 117:11-18, 118:8-14.) Believing Plaintiff had altered the doctor's note in violation of Peabody policies, Murawski met with Plaintiff on his next scheduled day of work, January 2, 2019, and informed Plaintiff he was being terminated "for falsifying a doctor's note." (Stip. Facts ¶ 35; Trial Tr. 119:20-22.) Plaintiff's termination was effective January 3, 2019. (Def.'s Trial Ex. 7, ECF No. 36-3 at 2) (Employee Status Change Form indicating termination for "falsification of any information relating to your employment and/or benefits including but not limited to, timekeeping, medical information or other records").

11.  Regarding the December 17, 2018 doctor's note, Plaintiff testified he saw the nurse practitioner, Melonie Blancaneaux, at the Tsehootsooi Clinic on that day, and she gave him a doctor's note excusing him from work beginning 12/17/18, which was a Monday, apparently not realizing he had been scheduled to work the previous day, which was a Sunday. Plaintiff asserts that when he pointed out the mistake, Ms. Blancaneaux corrected the note by writing a "6" over the "7." (*See* Trial Tr. 25:9-25.) Upon being accused by Murawski of falsifying the note during their January 2, 2019 meeting, Plaintiff offered to get another note or have Murawski talk to the doctor directly for clarification regarding the change; however, Murawski declined and instead told Plaintiff, "I made up my mind."[5] (Trial Tr. 30:19-31:9.)

---

[4] Plaintiff objected to admission of this assertion as hearsay. During trial, the Court ruled it may be admissible for the limited purpose of the effect on the hearer, but the substantive information provided by the declarant is not admissible for the truth of the matter asserted. (Trial Tr. 117:25-118:6.)

[5] At trial, Plaintiff and Mr. Murawski offered diametrically opposed versions of what transpired during this meeting on January 2, 2019. Murawski testified that, when he told Plaintiff about his concern the note was altered, Plaintiff was non-responsive and offered no explanation. (Trial Tr. 119:13-25.) The Court finds Murawski's account of Plaintiff's response not credible, however, given Murawski's admission that during

12. After that meeting, Plaintiff went to the Clinic and obtained a second note signed by Ms. Blancaneaux and dated January 2, 2019, which states: "This letter is to reinforce the accuracy of the work note given to you by Marshall Allen . . . . Pt was seen in the SDC and after evaluation, a work note was given for time off work *12/16/18-12/24/18*. Should you have any questions please done (sic) hesitate to contact me." (Pl.'s Trial Ex. 4, ECF No. 36-1 at 4) (emphasis added).[6] Plaintiff testified he then called Peabody's Human Resources office and advised Mr. Murawski he had received this second note from Ms. Blancaneaux clarifying her previous work excusal note for Plaintiff; however, Mr. Murawski refused to accept it and told Plaintiff he had "made up his mind." (*See* Trial Tr. 32:22-34:1, 37:9-15; Def.'s Trial Ex. 16 at 2, line 30 (record of 3-minute call made 1/2/2019 at 12:18 p.m. from Plaintiff's cell phone to Murawski's office phone).)

---

their previous meeting regarding Plaintiff's first termination, Plaintiff adamantly insisted he had notified his supervisors of his need to miss work because of his shoulder injury.

[6] Defendants objected to admission of this "letter" as unauthenticated, inadmissible hearsay. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). No authenticating affidavit is required; rather, a submitted exhibit may be sufficiently authenticated taking into consideration the appearance, contents, substance, or other distinctive characteristics, together with all the circumstances. *See Law Co., Inc. v. Mohawk Constr. and Supply Co., Inc.*, 577 F.3d 1164, 1171 (10th Cir. 2009) (citing FED. R. EVID. 901(b)(4)). The testimony of a witness with knowledge also satisfies the requirement. FED. R. EVID. 901(b)(1). Here, the "letter" is on the Tsehootsooi Medical Center letterhead, is signed (with the signatures on the letter and earlier work note appearing the same), and contains indicia of reliability, considering its contents and Plaintiff's testimony regarding the circumstances of its creation. Accordingly, there is sufficient evidence to support a finding the letter is what Plaintiff purports it to be. As to the hearsay objection, Rule 803(6) of the Federal Rules of Evidence provides an exception to the hearsay rule for business records if they are "kept in the course of a regularly conducted activity of a business, organization, occupation, or calling," and it was the regular practice of that business activity to make the record. "To satisfy Rule 803(6), 'a document must (1) have been prepared in the normal course of business; (2) have been made at or near the time of the events it records; . . . (3) be based on the personal knowledge of the entrant or of an informant who had a business duty to transmit the information to the entrant;' and (4) not have involved sources, methods, or circumstances indicating a lack of trustworthiness." *United States v. Gwathney*, 465 F.3d 1133, 1140-41 (10th Cir. 2006). The Court finds the letter satisfies the requirements for admission as a business record. Therefore, Defendants' objection is OVERRULED.

13.  At trial, Mr. Murawski admitted Plaintiff called him from the Clinic on January 2, 2019; but, again, he and Plaintiff offered diametrically opposed versions of what transpired during that call. Murawski claimed Plaintiff gave his cell phone to a Clinic employee who said nothing about a letter and told Murawski Plaintiff was there "bullying and yelling" at people about the altered doctor's note; Murawski testified he advised the employee there was nothing he could do for them and then the "phone went dead." (Trial Tr. 121:22-122:4, 16-18.) Murawski further testified Plaintiff never told him he had a letter clarifying the altered note and, if Plaintiff had told him that, he would have advised Plaintiff to provide the letter to Plaintiff's supervisors, or give the letter to him, or call the Peabody hotline.[7] (Trial Tr. 123:1-8, 18-25.) In an effort to impeach Plaintiff's testimony that he had obtained the clarifying letter while at the Clinic on January 2nd, Defendant's counsel asked Plaintiff about a notation in his Tsehootsooi Medical Center records indicating the Clinic contacted him on January 9, 2019, to inform him a "letter written by SD provider" was "ready for pick up." (Trial Tr. 51:16-52:3.) Plaintiff could not explain this entry, nor did Defendant call any other witness who could explain the entry. (*See* Trial Tr. 78:5-81:2.) So, the Court can only speculate as to what "letter" is being referenced. While Defendant's attempted impeachment creates some confusion about when and how Plaintiff obtained the 1/2/19 clarifying letter signed by Ms. Blancaneaux, it is ultimately inconsequential – neither party offered Plaintiff's medical records into evidence for proper consideration by the Court. Therefore, in determining what transpired between Plaintiff

---

[7] Murawski's testimony in this regard makes little sense to the Court in light of his earlier testimony that he, himself, determined the note had been altered and made the decision to terminate Plaintiff's employment for that reason.

and Mr. Murawski on January 2, 2019, the Court is left with: 1) Plaintiff's testimony that he went to the Clinic on that day following his second termination and received a letter clarifying he had been excused from work 12/16/18-12/24/18; 2) a letter dated 1/2/19 signed by the same nurse practitioner who had signed the 12/17/18 doctor's note excusing Plaintiff from work; and 3) evidence of a call from Plaintiff's cell phone to Murawski on 1/2/19. Mr. Murawski offered a different version of what was said during that phone call, but his recollection is questionable given he also testified Plaintiff never contacted him about his injury and the need to take leave, which was proven false by Plaintiff's cell phone records (*see, supra* ¶ 5).[8] Therefore, the Court finds Plaintiff attempted, twice, to explain the alteration to the 12/17/18 work excusal note – once during his January 2, 2019 meeting with Murawski when he was terminated and later that same day when he called Murawski from the Clinic – but Mr. Murawski was not interested in and refused to consider any explanation.

14. Lincoln Financial notified Peabody on January 7, 2019, that Plaintiff's FMLA leave request was approved and Plaintiff received short-term disability pay for the days of work he missed in December 2018. (Def.'s Trial Ex. 8, ECF No. 36-3 at 3-4.)

15. Plaintiff was making $31.75 per hour at Peabody when he was terminated. (Trial Tr. 44:15-16.) Plaintiff applied for at least seven jobs the week following his termination. *Id.* at 64:17-65:9. He began working at Empire in Mesa, Arizona on March

---

[8] Murawski also testified he could not recall the names of the Clinic employees he spoke to when he called to investigate the alteration to the 12/17/18 doctor's note; and although he purportedly sent an email to "corporate" regarding what he learned after contacting the Clinic, he was unable to find and produce the email. (Trial Tr. 150:15-151:10.)

11, 2019, where he made $18 per hour. *Id.* at 44:17-22. Plaintiff later began working at NECA on July 1, 2019, where he initially made $20.80 per hour and now makes $24 per hour. *Id.* at 44:23-45:19. Plaintiff paid his attorney $4,000.00. *Id.* at 46:3-6.

## CONCLUSIONS OF LAW

1. Courts have recognized two theories for recovery on claims for violation of the Family Medical Leave Act – "the retaliation or discrimination theory and the entitlement or interference theory." *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 960 (10th Cir. 2002).

> The retaliation or discrimination theory arises from [29 U.S.C. § 2615(a)(2)], which provides that "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." The entitlement or interference theory arises from § 2615(a)(1): "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter."

*Id.*

2. Plaintiff's claim is based on the retaliation theory. "Retaliation claims under the FMLA are subject to the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973)." *Metzler*, 464 F.3d at 1170. Under this analysis, if the plaintiff satisfies his initial burden of establishing a prima facie case of retaliation, the defendant must offer a legitimate, non-retaliatory reason for the employment action. *Id.* "The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual." *Id.*

3. To establish a prima facie case of retaliation, Plaintiff must show: (1) he engaged in a protected activity; (2) Peabody took an action that a reasonable employee

would have found materially adverse; and (3) there exists a causal connection between the protected activity and the adverse action. *Id.* at 1171. Plaintiff has met the first two requirements – he engaged in a protected activity by taking FMLA leave for an injury and "any reasonable employee would have found termination materially adverse." *Id.* To establish the third element of a prima facie case of retaliation, Plaintiff must show a causal connection between his protected activity of taking FMLA leave and Peabody's decision to terminate his employment. *Id.*

> The "critical inquiry" at this prima facie stage is whether the plaintiff has demonstrated that the [employer's] action occurred under circumstances which give rise to an inference of unlawful discrimination. . . . We have repeatedly recognized temporal proximity between protected conduct and termination as relevant evidence of a causal connection sufficient to justify an inference of retaliatory motive. We have emphasized, however, that a plaintiff may rely on temporal proximity alone only if the termination is *very closely* connected in time to the protected activity.

*Id.* (internal quotations and citations omitted) (emphasis in original). Here, Plaintiff's terminations were within days of his requesting FMLA leave; thus, temporal proximity alone is sufficient to justify an inference of retaliatory motive. *See id.* at 1171-72 (termination occurring about six weeks after employer knew plaintiff intended to engage in protected activity and within as little as four weeks of plaintiff's request for FMLA leave "very closely connected in time" to protected FMLA activity, thereby establishing third element of prima facie case).

  4. Defendant asserts a legitimate, nonretaliatory reason for its termination decision: Peabody ultimately fired Plaintiff because Murawski believed Plaintiff falsified the 12/17/18 doctor's note. Because Peabody's policies identify such misconduct as

warranting discipline, including termination, this would be a legitimate, nonretaliatory reason for terminating Plaintiff's employment.

5. To prevail, then, Plaintiff must show Peabody's stated reason for terminating his employment was pretextual, i.e. unworthy of belief. In attempting to establish pretext, the evidence presented by a plaintiff may take a variety of forms, and a plaintiff "may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). In some cases, evidence of causation and evidence of pretext may be the same and the tests for causation and pretext may be conflated. *See Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1318 (10th Cir. 2006). As discussed above, the very close temporal proximity here between Plaintiff's FMLA leave and termination is alone sufficient to justify an inference of retaliatory motive. However, while temporal proximity is one relevant factor in determining whether the employer's explanation is a pretext for retaliation, even very close temporal proximity cannot "operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext." *Metzler*, 464 F.3d at 1172. To establish pretext, Plaintiff must "present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive." *Id.*

6. One way a plaintiff might make a showing of pretext is with evidence the defendant's stated reason for the adverse employment action was false. *Kendrick*, 220 F.3d at 1230. Defendant contends Murawski honestly believed Plaintiff had falsified the 12/17/18 doctor's note. However, Murawski had very little evidence supporting his belief Plaintiff had altered the note – he simply asked someone in the Clinic's medical records

department about Plaintiff's 12/17/18 visit, and that someone told him Plaintiff had been excused from work 12/17/18 through 12/24/18. Murawski testified the medical records employee also supposedly told him they were looking at a copy of the same note in Plaintiff's file (*see* Trial Tr. 139:4-12), yet Defendant did not offer any unaltered note from Plaintiff's Tsehootsooi Clinic medical file into evidence (which would presumably have been produced with the other medical records). When asked during their December 26th meeting to provide a doctor's note excusing him from work the previous week, Plaintiff supposedly went out to his vehicle at that time then came back in and provided the 12/17/18 note to Murawski. Though Murawski had specifically asked Plaintiff to provide a note, the note is a simple form on a single page, and the alteration is readily noticeable, Murawski claimed he didn't notice the alteration until he looked more closely at the note two days later. Furthermore, Plaintiff's explanation for the excusal date on the note being changed is plausible – that the nurse practitioner was not aware he had been scheduled to work on Sunday, December 16th, the day before he could follow up with the Clinic on Monday, December 17th. Finally, Lincoln Financial determined Plaintiff's documentation was sufficient to grant him FMLA leave and pay him short-term disability for the days he missed work in December 2018, including December 16th.

7. Defendant further suggests Murawski was unaware of the January 2, 2019 letter from Blancaneaux prior to discovery in this case. However, the evidence supports a finding Plaintiff told Murawski he had obtained a second note from Ms. Blancaneaux confirming his excusal from work 12/16/18-12/24/18. Plaintiff has shown pretext based on the following evidence: (1) Peabody initially terminated Plaintiff for allegedly being a

"no call/no show" despite him having notified his supervisor and Murawski about his injury and having requested FMLA leave; (2) Murawski had little evidence that Plaintiff had altered the 12/17/18 note and refused Plaintiff's offer during their January 2, 2019 meeting to have the doctor clarify the alteration; and (3) Murawski refused to reconsider Plaintiff's termination after Plaintiff obtained a second note confirming that the doctor had excused him from work 12/16/18 through 12/24/18.

8. The Court concludes the evidence of temporal proximity in combination with the additional circumstantial evidence discussed above establishes that Peabody's asserted reason for terminating Plaintiff was a pretext for retaliation against Plaintiff for exercising his FMLA leave rights, in violation of the FMLA.

9. "Any employer who violates section 2615 of [title 29] shall be liable to any eligible employee affected for damages equal to the amount of any wages, salary, employment benefits, or other compensation denied or lost to such employee by reason of the violation." 29 U.S.C. § 2617(a)(1)(A)(i)(I). These damages may take the form of back pay, which is intended to compensate a plaintiff for lost wages and benefits before trial, and front pay, an equitable remedy designed to compensate a plaintiff for losses after trial. *See Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 964 (10th Cir. 2002). "The Court . . . shall, in addition to any judgment awarded to the plaintiff, allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant." 29 U.S.C. § 2617(a)(3).

10. At trial, Plaintiff requested damages in the form of back pay and one year of front pay, based solely on lost wages. Plaintiff also requested attorney's fees in the amount

of $4,000.00. Although reinstatement is the preferred remedy, *see Abuan v. Level 3 Commc'ns, Inc.*, 353 F.3d 1158, 1176 (10th Cir. 2003), it is not appropriate where the plaintiff has found other work, *Roush v. KFC Nat. Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir. 1993). The Court has considerable discretion in determining whether and how much front pay is appropriate, guided by the required attempt to make Plaintiff whole while avoiding a windfall. *Abuan*, 353 F.3d at 1176-77.

11. FMLA claimants have an obligation to make reasonable efforts to mitigate damages. *See Miller v. AT&T Corp.*, 250 F.3d 820, 838 (4th Cir. 2001); *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 938 (10th Cir. 1979). The employer bears the burden of showing the plaintiff did not mitigate damages. *Lee Way Motor Freight*, 625 F.2d at 937. " In order to satisfy the burden, . . . the defendant must establish (1) that the damage suffered by plaintiff could have been avoided, i.e. that there were suitable positions available which plaintiff could have discovered and for which he was qualified; and (2) that plaintiff failed to use reasonable care and diligence in seeking such a position." *Equal Employment Opportunity Comm'n v. Sandia Corp.*, 639 F.2d 600, 627 (10th Cir. 1980) (internal quotation and citation omitted).

12. Here, Defendant failed to establish Plaintiff did not make reasonable efforts to find comparable employment – the week following his termination, Plaintiff applied for several jobs substantially similar to the job he held at Peabody, and accepted a position beginning two months later. *See Miller*, 250 F.3d at 838 ("A plaintiff in an employment discrimination case must mitigate damages by diligently seeking and accepting new employment substantially equivalent to that from which he was discharged."). Defendant

suggested Plaintiff would have made more money if he had returned to work with Boilermakers 627, which was his employer prior to working at Peabody. (Trial Tr. 65:10-14.) However, Plaintiff testified he did not have children at the time he held the Boilermakers job, which required travel "all over the country" and two to three months at a time away from home, and taking such a job now would hurt his relationship with his boys. (Trial Tr. 65:19-66:2.) *See Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 625 (6th Cir. 1983) ("It is well settled that a claimant has not failed to make a reasonable effort to mitigate damages where he refused to accept employment that is an unreasonable distance from his residence."). Defendant failed to establish with any particularity there were other higher-paying positions available to Plaintiff that he unreasonably failed to seek.

13. The Court concludes Plaintiff made reasonable efforts to mitigate his damages by promptly and diligently applying for and accepting comparable work. Plaintiff has suffered a loss in wages as a result of Defendant's retaliation and is, therefore, entitled to back pay. Because Plaintiff had been employed with Peabody for nearly eight years, but will also likely continue to receive raises from his present employer or have opportunities for other higher-paying and comparable jobs in the area, the Court also concludes Plaintiff's request for one year front pay is reasonable and supported by the evidence and should give him sufficient time to equalize his pay loss. *See Downes v. Volkswagen of Am., Inc.*, 41 F.3d 1132, 1142 (7th Cir. 1994) ("a front pay award must be grounded in available facts, acceptable to a reasonable person and not highly speculative").

14. Plaintiff calculated his lost wages based on an average daily wage of $180.93 while he was working at Peabody (*see* Trial Tr. 173:12-174:6). Although this method for calculating his losses is simple and reasonable, the Court finds Plaintiff failed to properly calculate the *difference* between the wages he would have made at Peabody and the wages he later made and is now making with other employers. Thus, the Court calculates Plaintiff's lost wages (based on an average daily wage) as follows:

| | |
|---|---|
| Lost wages from 1/3/2019 through 3/8/2019 (while unemployed) | $11,760.45 |
| Lost wages from 3/9/2019 through 6/30/2019 (while employed with Empire @ $18/hour) | $ 8,853.55 |
| Lost wages from 7/1/2019 through 1/13/2020 (while employed with NECA @ $20/hour) | $13,191.12 |
| Lost wages from 1/14/2020 through 1/28/2021 (while employed with NECA @ $24/hour) | $16,780.80 |

Accordingly, Plaintiff is entitled to $50,585.92 in lost wages ($34,467.52 in back pay and $16,118.40 in front pay), plus reasonable attorney's fees in the amount of $4,000.00.

THEREFORE, it is hereby

ORDERED that based upon the foregoing findings of fact and conclusions of law, Plaintiff is entitled to Judgment in his favor and against the Defendant for back pay, front pay, and attorney's fees in the total amount of $54,585.92.

Dated this 28Th day of February, 2020.

_____
Scott W. Skavdahl
United States District Judge